IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION

| | | |
|---|---|---|
| MILDRED BERRY AS GUARDIAN, AND | § | |
| AS NEXT FRIEND OF TERRELL | § | |
| MICHAELLE THOMAS | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | C.A. NO. 4:22-CV-00331 |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| *Defendant*. | § | |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant Union Pacific Railroad Company (hereinafter "Union Pacific") respectfully

submits this Motion for Summary Judgment and Brief in Support, and would respectfully show

the Court as follows:

## I. TABLE OF CONTENTS

II.   TABLE OF CITATIONS ................................................................ 2
III.  NATURE AND STAGE OF THE PROCEEDING ............................... 3
IV.   STATEMENT OF THE ISSUES .................................................. 4
V.    SUMMARY OF THE ARGUMENT ............................................. 5
VI.   SUMMARY JUDGMENT EVIDENCE………………………………………6
VII.  ARGUMENT & AUTHORITIES ................................................. 6
   A.  Summary Judgment Standard .................................................. 6
   B.  No Duty, Breach, or Proximate Cause ....................................... 7
      (1) Factual Background ……………………………………………..….7
      (2) Union Pacific Owed No Duty to Warn, Keep a Lookout . ..................... 12
         (a) No Duty to Warn Thomas ................................................. 12
         (b) No Duty to Inspect, Keep Lookout ...................................... 14
      (3) Union Pacific Did Not Breach Duty Owed to Thomas ........................ 16
         (a) Thomas Warned by Posted Signage and Active Train Operations ............ 17
         (b) Thomas Warned by Train's Active Movement ........................... 18
         (c) Train Gave Audible and Visual Warnings Before Movement ................ 18
         (d) Union Pacific Inspected Track, No Duty to Re-inspect, Protected Movements... 19
      (4) Thomas's Actions Proximately Caused Her Injuries ........................ 20
   C.  No Basis for Gross Negligence Claims ....................................... 23
VIII. PRAYER ..................................................................... 24

## II. TABLE OF CITATIONS

**Cases:**

*Adams v. Travelers Indem. Co.*, 465 F.3d 156, 164 (5th Cir. 2006)...........................................7

*Alston v. Baltimore & O. R. Co.*, 433 F. Supp. 553, 570 (D.D.C. 1977)....................................18

*Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 266
  (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ...............................................21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ...............................................6

*Barnes v. Kansas City S. Ry. Co.*, No. 4:14-CV-68, 2016 WL 4801511
  (S.D. Tex. Feb. 19, 2016) ....................................................................... 13, 14, 17

*Berry v. Union Pac. R.R. Co.*, No. CV H-22-331, 2022 WL 2292884
  (S.D. Tex. June 24, 2022) ...............................................................................14

*Boerjan v. Rodriguez*, 436 S.W.3d 307 (Tex. 2014)...........................................................12, 13

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) ...................................................................6

*Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995)........................................12

*Davenport v. Texas & N.O.R. Co.*, 72 S.W.2d 933 (Tex. Civ. App.—Austin 1934, no writ)......22

*Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).....................................21

*Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995)............................21

*George v. Tex. & N. O. R. Co.*, 290 S.W.2d 264, 266
  (Tex. Civ. App.—Galveston 1956, writ ref'd n.r.e.) ...............................................15

*Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) ...........................12

*Gulf, C. & S.F. Ry. Co. v. Gaddis*, 208 S.W. 895, 896 (Tex. Comm'n App. 1919)...................21

*Gulf, C. & S.F. Ry. Co. v. Matthews*, 93 S.W. 1068 (Tex. 1906)..........................................22

*Gulf, C. & S.F. Ry. Co. v. Moss*, 180 S.W. 1128 (Tex. Civ. App.—Dallas 1915, writ ref'd)......15

*Herrera v. S. Pac. Ry. Co.,* 10 Cal. Rptr. 575, 580 (Cal. Ct. App. 1961) ...................................18

*IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 799 (Tex. 2004). . 21

*Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001) .......................................24

*Lewis v. United Parcel Service, Inc.*, 175 S.W.3d 811, 814
  (Tex. App.—Houston [1st Dist] 2004, writ.)...............................................................12

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) ...............................................7

*Louisiana-Pacific Corp. v. Andrale*, 19 S.W.3d 245, 247 (Tex. 1999) .......................................23

*McBeth v. Tex. & Pac. Ry. Co.*, 414 S.W.2d 45, 49–50
  (Tex. Civ. App.—Fort Worth 1967, writ ref'd n.r.e.)...............................................17

*Missouri, K. & T. Ry. Co. of Tex. v. Wall*, 116 S.W. 1140, 1141 (Tex. 1909) ...........................22

*Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)...........................................24

*Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009)..................... 16, 20, 21

*Nixon v. Norfolk S. Corp.*, 295 Fed. Appx. 523, 525 (3d Cir. 2008) ........................................17

*Peerenboom v. HSP Foods, Inc.*, 910 S.W.2d 156, 164–65 (Tex. App.—Waco 1995, no writ).. 21

*Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) .......................................7

*Rutherford v. Ill. Cent. R. Co.*, 276 F.2d 330, 336 (5th Cir. 1960)........................................21

*San Antonio & A.P. Ry. Co. v. Singletary*, 251 S.W. 325, 326
  (Tex. Civ. App.—San Antonio 1923, writ dism'd w.o.j.) ...............................................17, 21

*St. Louis Sw. Ry. Co. of Tex. v. Davis*, 110 S.W. 939, 945 (Tex. Civ. App. 1908, writ ref'd)..15, 16

*Tex. Midland R. Co. v. Byrd*, 115 S.W. 1163, 1165 (Tex. 1909)...........................................22

*Tex. Utils. Elec. Co. v. Timmons,* 947 S.W.2d 191, 193 (Tex.1997)........................................13

*Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex. 1994) ......................................................... 24
*W. Investments, Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex. 2005) ............................................... 21
**Statutes:**
49 C.F.R. § 218.99 ........................................................................................................ 19, 20
Tex. Civ. Prac. & Rem. Code § 41.001(11)........................................................................... 24
Texas Civil Practice & Remedies Code § 75.007(b) ................................................................ 13
**Rules:**
Fed. R. Civ. P. 56(a) ........................................................................................................... 6
**Treatises:**
Restatement (Second) of Torts § 333 cmt. b (1965)..................................................................... 13

## III. NATURE AND STAGE OF THE PROCEEDING

1.      This lawsuit arises out of an August 13, 2020 accident wherein Terrell Michelle Thomas ("Thomas") suffered serious injuries while trespassing through Union Pacific's Settegast Yard (the "Yard"). Docket Entry No. 1-3 at ¶ 6. Mildred Berry ("Berry"), as guardian and next friend of Thomas, sued Union Pacific in the 133rd Judicial District of Harris County, Texas (the "State Court") for those injuries, alleging negligence *per se* and gross negligence. *Id.* at 1, 2–3.

2.      Union Pacific timely removed the State Court action based on diversity. Docket Entry No. 1. Union Pacific subsequently moved to dismiss arguing Berry failed to state a claim because: (1) her complaint contained no facts alleging why she was authorized to bring claims on Thomas's behalf; (2) she failed to identify a statute protecting Thomas, as a negligence *per se* requires; and (3) she failed to allege facts supporting a gross negligence because the complaint did not allege facts showing its duty to Thomas, breach, and proximately cause. Docket Entry No. 5.

3.      On April 5, 2022, the Court granted Union Pacific's motion on the basis that Berry did not plead that she had authority to sue on behalf of Thomas, but did not opine on Union Pacific's other bases for dismissal. Docket Entry No. 7. The Court permitted Berry to file an amended complaint and cure other pleading deficiencies. *Id.*

4.      On April 22, 2022, Berry filed an amended complaint adding allegations that: (1) she held a power of attorney for Thomas and brought suit as Thomas's "next friend;" (2) "UPRC

failed to maintain the fencing and gates surrounding its rail yard which permitted the general public

access to the rail yard;" and (3) "[a]t all times relevant, UPRC tolerated Thomas'[s] access to and

presence on the premises which it controlled and maintained." Docket Entry No. 10, at ¶¶ 2, 4.

5.      Union Pacific again moved to dismiss on the basis Berry's First Amended

Complaint failed to articulate: (1) facts showing it owed Thomas a recognized duty, and (2) the

statute under which Berry moved to establish a negligence *per se* claim. Docket Entry No. 12.

6.      The Court heard arguments on June 1, 2022, and the parties submitted supplemental

briefing on June 3, 2022. Docket Entry Nos. 16–18. On June 24, 2022, the Court dismissed with

prejudice Berry's negligence and gross negligence claims based on failure to maintain the premises

and as to negligence *per se*, and dismissed without prejudice Berry's negligence and gross

negligence claims based on Union Pacific's alleged failure to warn by sounding a signal for the

approaching train. Docket Entry No. 21.

7.      On July 8, 2022, Berry filed her Second Amended Complaint alleging negligence

and gross negligence and asserting Union Pacific failed to keep a lookout and failed to warn

Thomas of the oncoming railcar. Docket Entry No. 23, at ¶ 5.

8.      The discovery deadline was March 10, 2023, and the deadline for pretrial

dispositive motions is March 24, 2023. Docket Entry No. 26.[1]

## IV. STATEMENT OF THE ISSUES

9.      Union Pacific now seeks a summary judgment on Berry's remaining negligence

and gross negligence claims. The issues presented to the Court are whether (a) Union Pacific owed

---

[1] On February 21, 2023, Berry filed a motion for leave to amend Plaintiff's Second Amended Complaint to add back in claims for negligence and gross negligence previously dismissed by the Court with prejudice. Docket Entry No. 39. Union Pacific filed its response and brief in opposition on February 28, 2023. Docket Entry No. 40. Because Berry's motion is still pending, and the deadline to file dispositive motions is March 24, 2023, Union Pacific files this Motion for Summary Judgment on Berry's live pleading, Plaintiff's Second Amended Complaint, but reserves the right to seek leave to file an amended dispositive motion should the Court grant Berry's motion for leave.

a duty to Thomas; (b) Union Pacific breached any duty owed to Thomas; (c) Thomas's actions proximately caused her injuries; and (d) there is any basis for Berry's gross negligence claims. Union Pacific provides the legal standard in the below Section VII.

## V. SUMMARY OF THE ARGUMENT

10.     Union Pacific is entitled to a summary judgment because (a) it owed only a duty to avoid injuring Thomas willfully, wantonly, or through gross negligence, (b) even if a licensee, it owed no duty to warn of obvious dangers and Thomas was warned by the tracks, train movement, and train's audible and visual warnings, and (c) it owed no duty to keep a lookout or inspect underneath the middle of the train as it was being switched in the Yard.

11.     Alternatively, even if Thomas was owed a duty of care, Union Pacific did not breach any such duty because (a) the posted signage and active train operations warned Thomas of potential dangers as she approached and entered the Yard; (b) Thomas was warned of the involved train's potential for movement because it occupied the subject track and was actively moving before the accident; (c) the involved train gave audible and visual warnings of movement before the accident; and (d) it inspected the location before the accident and there was no requirement to re-inspect.

12.     Thomas proximately caused her own injuries. Her injuries were the natural and probable result of voluntarily trespassing through the Yard and crawling underneath a railcar while the train was actively switching cars. Thomas had safe alternatives available to her within a convenient distance, yet she chose a dangerous course of action for personal convenience. Thomas and Berry both acknowledge this accident would not have happened but for Thomas's actions.

13.     Finally, Berry's gross negligence claims fail because the underlying negligence claims fail, and Berry has no evidence of the objective or subjective elements of gross negligence.

## VI. SUMMARY-JUDGMENT EVIDENCE

14.     Attached in a separate Appendix and incorporated herein, Union Pacific offers the

following summary-judgment evidence:

Exhibit A: Affidavit of Bill Hill
Exhibit B: Jhamal Swift Deposition
Exhibit C: Eric Okenkpu Deposition
Exhibit D: Willis Walker Deposition
Exhibit E: Mildred Berry Deposition
Exhibit F: Terrell Thomas Deposition
Exhibit G: Verification by Robert K. Piwetz
Exhibit H: Train Event Recorder Data

## VII. ARGUMENT & AUTHORITIES

### A.     Summary Judgment Standard

15.     Summary judgment is appropriate when the pleadings and evidence on file show

that no genuine issue exists as to any material fact and that the moving party is entitled to judgment

as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial

burden of informing the court of the basis for its motion and identifying those portions of the

pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which

it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S.

317, 323 (1986). The moving party can also meet its burden by "pointing out to the district court

that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325 (internal

quotation omitted).

16.     Once the movant makes this showing, the non-movant must then direct the court's

attention to evidence in the record sufficient to establish that there is a genuine issue of material

fact for trial. *Id*. at 324. The non-movant must go beyond its pleadings and designate specific facts

to show there is a genuine issue for trial. *Id*.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986). Rule 56 imposes no obligation for a court "to sift through the record in search of evidence

to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 164 (5th Cir. 2006) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)). "[*The non-movant's*] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).

**B.     No Duty, Breach, or Proximate Cause**

**(1)     Factual Background**

17.     In order to better illustrate the issues before the Court, Union Pacific offers the following undisputed material facts.

18.     Union Pacific maintains the Yard, located at 6800 Kirkpatrick Blvd., Houston, Texas, consisting of a large complex of railroad facilities covering approximately 300 acres. Exhibit A, Affidavit of Bill Hill, pg. 4. The Yard is approximately a mile long, running north and south, with its northern border near Ley Road. Exhibit E, Berry Deposition, pg. 39, ln. 20–pg. 41, ln. 19, Exhibit C, Okenkpu Deposition, pg. 40, ln. 13–19. At the time of the accident, the Yard was an active railyard with inbound and departing trains, as well as train building and switching jobs, operating 24 hours a day, every day of the year. Exhibit A, Affidavit of Bill Hill, pg. 4; Exhibit B, Swift Deposition, pg. 63, ln. 9–15; Exhibit C, Okenkpu Deposition, pg. 24, ln. 3–7, pg. 66, ln. 8–15; Exhibit D, Walker Deposition, pg. 53, ln. 25–pg. 54, ln. 10.

19.     Sometime in the early morning hours of August 13, 2020, Thomas left Berry's house with the intention of going to her friend's home located on the east side of the Yard. Exhibit F, Thomas Deposition, pg. 24, ln. 7–9; pg. 31, ln. 2–9; pg. 35, ln. 7–10; pg. 36, ln. 3–pg. 37, ln. 4; Exhibit E, Berry Deposition, pg. 11, ln. 2–9. Berry's house was located at 6962 Peyton Street and was approximately 1-2 miles southwest of the Yard. *Id.*, pg. 39, ln. 20–pg. 41, ln. 19.

20.     After leaving Berry's house, Thomas biked east along Ley Road towards the Yard. Exhibit F, Thomas Deposition, pg. 40, ln. 12–18; pg. 41, ln. 17–21; pg. 67, ln. 14–22. It took Thomas "about 30 minutes" to get from Berry's home to the Yard. *Id.*, pg. 44, ln. 18–24.

21.     Instead of using the protected sidewalks on the Ley Road overpass to cross over the Yard, Thomas trespassed through the Yard using a private access point and road running parallel to, and almost directly underneath, the Ley Road overpass. *Id.*, pg. 27, ln. 6–pg. 28, ln. 1; pg. 45, ln. 3–15. The Yard had warning signs posted at the access points indicating no trespassing and the use of remote-control locomotives. Exhibit C, Okenkpu Deposition, pg. 63, ln. 19–pg. 64, ln. 8; Exhibit B, Swift Deposition, pg. 41, ln. 24–pg. 42, ln. 9; pg. 51, ln. 18–pg. 52, ln. 7; Exhibit D, Walker Deposition, pg. 54, ln. 20–pg. 55, ln. 5. The Yard had fencing, including the area in and around Ley Road and the access points, as well as overhead exterior lighting and video surveillance cameras. Exhibit B, Swift Deposition, pg. 37, ln. 20–pg. 39, ln. 7; pg. 61, ln. 5–pg. 62, ln. 18; Exhibit E, Walker Deposition, pg. 54, ln. 20–pg. 55, ln. 5. The Yard did not have any public railroad crossings, and Thomas did not have permission to enter the Yard. Exhibit B, Swift Deposition, pg. 52, ln. 8–21; Exhibit D, Walker Deposition, pg. 53, ln. 15–20. Thomas knew the Yard was not a public crossing, but she chose to use it because she thought it was faster. Exhibit F, Thomas Deposition, pg. 47, ln. 19–21; pg. 49, ln. 3–21; pg. 69, ln. 10–12.

22.     After entering the Yard, Thomas continued east towards five sets of railroad tracks running north and south. Thomas did not have a flashlight or reflective clothing. *Id.*, pg. 44, ln. 6–17. At no point did Thomas do anything to alert others to her presence or seek help to get across the tracks. *Id.*, pg. 50, ln. 12–18; pg. 60, ln. 13–19; pg. 62, ln. 16–24. Thomas crossed over the unoccupied westernmost track with her bike and approached the train involved in the accident, Union Pacific's YHO30R-12 (the "Train"), occupying the next track (the "Track"). *Id.*, pg. 45, ln.

19–pg. 46, ln. 18, Exhibit 5 (*red arrow and "X" indicate Thomas's approximate route and accident location*); Exhibit B, Swift Deposition, pg. 49, ln. 19–pg. 51, ln. 2.





23.     The Train occupied the Track at the accident location – and was actively moving – before Thomas arrived. At approximately 00:14:40 a.m., the Train, operated remotely by Union Pacific Conductor Willis Walker, entered a "Remote Control Zone" ("RCZ") on the Track and occupied the accident location. Exhibit A, Affidavit of Bill Hill, pg. 7; Exhibit H, Event Recorder Data, UP/Thomas 929, 987, 1045, 1103; Exhibit D, Walker Deposition, pg. 7, ln. 15–pg. 8, ln. 3; pg. 9, ln. 17–pg. 10, ln. 9; pg. 16, ln. 14–25. An RCZ is a permanent portion of track designated specifically for remote switching movements, and contains physical sensors intended to prevent locomotives from entering or leaving the area and to ensure the zone is free from obstructions. Exhibit D, Walker Deposition, pg. 20, ln. 3–pg. 21, ln. 4. The RCZ included the accident location.

*Id.*, pg. 21, ln. 5–13; pg. 24, ln. 7–pg. 27, ln. 20. Before the Train entered the RCZ, Walker verified the RCZ was activated and clear of obstructions. *Id.*, pg. 20, ln. 3–pg. 22, ln. 24; pg. 52, ln. 19–pg. 53, ln. 9

24.     From approximately 00:14:40 a.m. until 00:52:39 a.m., the Train was engaged in continuous switching operations – consisting of incremental southward movements to uncouple and release railcars – and occupied the Track at the accident location. Exhibit A, Affidavit of Bill Hill, pg. 7-9; Exhibit H, Event Recorder Data, UP/Thomas 687-910, 929-968, 987-1026, 1045-1084, 1103-1142. During that time, the Train stopped a total of 25 times, for an average of 53.56 seconds per stop, with the longest stop being 3 minutes and 23 seconds:

> (1) 28 seconds; (2) 3 minutes, 23 seconds; (3) 16 seconds; (4) 2 minutes, 9 seconds; (5) 28 seconds; (6) 1 minute, 17 seconds; (7) 47 seconds; (8) 37 seconds; (9) 32 seconds; (10) 1 minute, 2 seconds; (11) 29 seconds; (12) 28 seconds; (13) 29 seconds; (14) 56 seconds; (15) 16 seconds; (16) 11 seconds; (17) 1 minute, 19 seconds; (18) 1 minute, 6 seconds; (19) 19 seconds; (20) 6 seconds; (21) 1 minute, 8 seconds; (22) 1 minute, 14 seconds; (23) 1 minute, 27 seconds; (24) 52 seconds; and (25) 1 minute.

Exhibit A, Affidavit of Bill Hill, pg. 7-9; Exhibit H, Event Recorder Data, UP/Thomas 687-910, 929-968, 987-1026, 1045-1084, 1103-1142. As this occurred, Walker was positioned on the ground at the "pin-pulling position," at the end of the Train opposite from the remote-control locomotive in order to visually determine if the Track was clear in the Train's direction of travel and release cars onto different classification tracks. Exhibit D, Walker Deposition, pg. 13, ln. 16– pg. 14, ln. 6; pg. 18, ln. 1–pg. 20, ln. 2; pg. 27, ln. 21–pg. 28, ln. 5; pg. 37, ln. 1–8. At approximately 00:52:39 a.m., the Train departed the accident location. Exhibit A, Affidavit of Bill Hill, pg. 9.

25.     While engaged in switching operations, the Train gave audible and visual warnings prior to moving. Before each movement, the locomotive bell automatically rang and the strobe lights flashed as a warning. Exhibit A, Affidavit of Bill Hill, pg. 9; Exhibit C, Okenkpu Deposition, pg. 24, ln. 8–pg. 25, ln. 1, pg. 66, ln. 16–pg. 67, ln. 15; Exhibit D, Walker Deposition, pg. 57, ln.

4–pg. 58, ln. 3. The Train also gave other audible warnings including: (a) the locomotives' diesel engines increased in revolutions causing it to become louder; (b) the air brake system exhausted loud flows of air at each rail car and locomotive; (c) the brake rigging (brake cylinder, rods, levers, links, chains, and brake beams) under each railcar made audible noises as it moved to the release position; and (d) the coupler system (draft gears, cross-keys, couplers, knuckles, uncoupling levers, etc.) combined to make audible noises as movement began. Exhibit A, Affidavit of Bill Hill, pg. 9-10; Exhibit D, Walker Deposition, pg. 57, ln. 10–pg. 58, ln. 14. Additionally, the slack between each railcar created audible noises. Exhibit A, Affidavit of Bill Hill, pg. 10. As the Train began moving, the slack action would bunch – each railcar would compress against the other – and create a loud, distinctive sound. *Id*. This compressing action would begin at the end attached to the locomotive and cause a domino effect of noise as it moved throughout the Train. *Id*. This slack action would have occurred each time the Train started during the switching operations. *Id*.

26. Upon reaching the Train, Thomas waited next to it for "about five minutes" before attempting to cross the Track. Exhibit F, Thomas Deposition, pg. 49, ln. 22–pg. 50, ln. 11. Thomas then crawled on her hands and knees, with her bike, underneath a railcar near the middle of the Train. *Id*., pg. 50, ln. 19–25; pg. 52, ln. 3–7; pg. 53, ln. 22–24; Exhibit E, Berry Deposition, pg. 48, ln. 5–12. Thomas knew she should not crawl under the railcar. Exhibit F, Thomas Deposition, pg. 69, ln. 10–22. Thomas was underneath the railcar for "about 5 to 10 minutes" before the Train started moving and crushed her legs. *Id*., pg. 52, ln. 23–pg. 53, ln. 5; pg. 54, ln. 18–pg. 55, ln. 20.

27. Thomas was later found laying on the Track just south of the Ley Road overpass with her damaged bike between the rails. Exhibit C, Okenkpu Deposition, pg. 36, ln. 17– pg. 37, ln. 19; Exhibit B, Swift Deposition, pg. 11, ln. 25–pg. 13, ln. 15.

**(2)      Union Pacific Owed No Duty to Warn, Keep a Lookout**

28.      Berry asserts a general negligent activity claim alleging Union Pacific failed to keep a lookout and failed to warn Thomas of the oncoming railcar. Docket Entry No. 23, at ¶ 5. "In the case of a negligence activity claim, general negligence rules apply." Docket Entry No. 21, pg. 8 (citing *Lewis v. United Parcel Service, Inc.*, 175 S.W.3d 811, 814 (Tex. App.—Houston [1st Dist] 2004, writ.)). The threshold inquiry in a negligence case is whether the defendant owes a legal duty to the plaintiff. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The plaintiff must establish the existence of a duty owed by the defendant to establish liability in tort. *Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990).* The existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Id.*

29.      Union Pacific is entitled to summary judgment because (a) it owed Thomas only a duty to avoid injuring her willfully, wantonly, or through gross negligence, (b) even if a licensee, it owed no duty to warn of obvious dangers, and Thomas was reasonably warned by the Yard, tracks, train movement, and audible and visual warnings coming from the train; and (c) it owed no duty to keep a lookout or inspect underneath a railcar near the middle of the Train as it was being switched in the Yard.

**(a)      Union Pacific Owed No Duty to Warn Thomas**

30.      In *Boerjan v. Rodriguez*, the Texas Supreme Court addressed the duty a landowner or occupier owes to a trespasser. 436 S.W.3d 307 (Tex. 2014). A driver trespassed on a ranch while transporting a family. *Id.* at 309. After being confronted by a ranch employee, the trespassing driver fled at high speed, and the vehicle rolled over, killing the family. *Id.* The decedents' family filed wrongful death claims, including negligence and gross negligence. *Id.* The Court held "[b]ecause our case law makes clear that a land occupier owes only a duty to avoid injuring a

trespasser willfully, wantonly, or through gross negligence, a claim for simple negligence must fail." *Id.* (citing *Tex. Utils. Elec. Co. v. Timmons,* 947 S.W.2d 191, 193 (Tex.1997)). "By its plain language, this duty does not support a simple negligence claim." *Id.* at 311 (citing Restatement (Second) of Torts § 333 cmt. b (1965)). Indeed, the Texas legislature has codified this common-law rule in Texas Civil Practice & Remedies Code § 75.007(b), which provides that "[a]n owner, lessee, or occupant of land does not owe a duty of care to a trespasser on the land and is not liable for any injury to a trespasser on the land, except that an owner, lessee, or occupant owes a duty to refrain from injuring a trespasser willfully, wantonly, or through gross negligence."

31.     Here, there is no dispute Thomas was trespassing at the time of the accident. As discussed above, Thomas did not have permission to enter the Yard; the Yard was fenced with "no trespassing" signs posted; she entered the Yard using a private access point knowing it was not a public crossing; and chose to trespass because she thought it was faster. Because Union Pacific owed Thomas only a duty to avoid injuring her willfully, wantonly, or through gross negligence, Berry's claim for simple negligence must fail.

32.     Even if transformed into a licensee, Union Pacific owed Thomas no duty to warn of the obvious dangers presented by crossing a railroad track and crawling underneath an actively moving railcar, and Thomas was sufficiently warned by the tracks, the Train, and the audible and visual warnings coming from the Train. In *Barnes v. Kansas City S. Ry. Co.*,  two pedestrians were struck by a train while crossing the railroad tracks in an area where it was illegal for pedestrians to be walking. No. 4:14-CV-68, 2016 WL 4801511, at *1 (S.D. Tex. Feb. 19, 2016) . "Plaintiffs contend that because of the excessive use of the path crossing the railway by persons commuting around town, [the railroad] knew persons were often on this path. Plaintiffs argue that this

knowledge legally changed Decedents status from trespassers to licensees." *Id.*, at *3. In *Barnes*, the Court noted:

> The law provides that for licensees, they must be warned of a danger if a proprietor knows it exists, *and the licensees do not.* Ignorance cannot be claimed for obvious danger such as a railroad crossing. Railroad tracks, like roadways, present an inherent danger. It is not [*the railroad's*] duty to be the public's keeper and warn of all dangers regardless of how obvious. So while there is the additional duty of warning of unknown, unsafe conditions for a licensee, in the present case, the distinction is not applicable.
>
> Regardless, Plaintiffs go even further and suggest that despite the obvious danger, [*the railroad*] should have put up a fence around the railroad tracks to protect the public. Railroad companies are an integral part of the movement of goods throughout the nation. To that end, thousands of miles of railroad track exist throughout the country. It cannot be said the railroad has a duty to put fences or other barriers around its entire track to prevent pedestrians from crossing over them. The Decedents were sufficiently warned by the tracks, the train itself, and the train's horn that the engineers engaged while approaching the Decedents.

*Id.*, at *3 (internal citations omitted).

33.     The dangers presented by entering an active railyard, crossing railroad tracks, and crawling underneath a railcar part of an actively moving train were obvious and inherent dangers, and Union Pacific had no duty to warn Thomas as she was sufficiently warned by the tracks, the Train, and the audible and visual warnings coming from the Train.

### (b)     Union Pacific Owed No Duty to Inspect, Keep Lookout

34.     Union Pacific owed no duty to keep a lookout or inspect underneath a railcar near the middle of the Train as it was being switched in the Yard.

35.     While a railroad, in the operation of its trains, owes a general duty to keep a lookout for persons or objects on its track, *Berry v. Union Pac. R.R. Co.*, No. CV H-22-331, 2022 WL 2292884, at *5 (S.D. Tex. June 24, 2022), that duty does not extend to the area behind the locomotive after it has passed or underneath a railcar, near the middle of the Train, while being switched in the Yard. It has long been the law that, even when a yard is known to have trespassers,

a railroad is not required to inspect the entire length of a train in the yard before moving. *George v. Tex. & N. O. R. Co.*, 290 S.W.2d 264, 266 (Tex. Civ. App.—Galveston 1956, writ ref'd n.r.e.) (duty of railroad in connection with movement of trains is to keep a lookout to prevent injury to anyone who may be on tracks or approaching them; railroad is not required to see that intruders do not rush into obvious dangers after train has passed); *St. Louis Sw. Ry. Co. of Tex. v. Davis*, 110 S.W. 939, 945 (Tex. Civ. App. 1908, writ ref'd); *Gulf, C. & S.F. Ry. Co. v. Moss*, 180 S.W. 1128 (Tex. Civ. App.—Dallas 1915, writ ref'd).

36.     Texas courts have long declined to impose upon the railroad a duty "before starting its train . . . to have sent some one of its employees along practically the entire length of the train to ascertain if any person was on or under any one of the cars of the train or within such proximity thereto as to reasonably lead to the belief that he would get on or under the car and into a place of danger." *Gulf, C. & S.F. Ry. Co.*, 180 S.W. at 1131. The court, citing *St. Louis Sw. Ry. Co.. v. Davis*, 110 S.W. 939, noted:

> [n]o adjudicated case has been cited holding that such a duty rests upon a railway company under such or a similar state of facts as we have in the present case, and we know of no case so holding. On the contrary we think the case [*Davis*], in which a writ of error was denied by the Supreme Court, holds, in effect, that no such duty is imposed upon railway companies.

*Id.* The court reasoned it would be an unjust and unfair burden to impose on railroads the duty to inspect trains being switched in the yard:

> But this rule the court holds, and which was approved by the Supreme Court, imposes upon the servants of railway companies only the duty of keeping a lookout along their tracks ***ahead*** in the direction in which the trains may be moving to avoid collisions with and injury to any person who may be upon the track. To impose the duty upon the servants of a railway company to look ***ahead*** to discover persons who may be upon its track ***in front of an approaching train***, and thus avoid injury to such persons, is a practicable and reasonable rule, ***but to impose upon them the further obligation or duty to inspect their trains being switched in their yards when or after being set in motion for the purpose of discovering and avoiding running over and injuring even children who may be trespassing upon their premises and cars is to impede***

***the progress of their work***, and, as said in *Railway v. Davis*, supra, place upon them an unreasonable and unjust burden.

*Id*. at 1132 (emphasis added).

37.     Contrary to Berry's allegations, Thomas was not struck by the end movement of an oncoming or approaching railcar; she was injured because she crawled underneath a railcar – near the middle of the Train – while the Train was actively switching in the Yard. Imposing a duty on railroad employees to inspect the entire length of a train in the Yard would create an unjust and unfair burden and impede their work. It is also an impractical means of discovering trespassing persons because by the time an employee walks the length of a train, possibly a mile or more, the circumstances can change and trains will be stopped even longer and invite more trespassers. Exhibit D, Walker Deposition, pg. 56, ln. 6–pg. 57, ln. 3.

38.     Accordingly, Union Pacific is entitled to a summary judgment because (a) it owed Thomas only a duty to avoid injuring her willfully, wantonly, or through gross negligence, (b) even if a licensee, it owed no duty to warn of obvious dangers, and Thomas was reasonably warned by the Yard, tracks, train movement, and audible and visual warnings coming from the train; and (c) regardless of status, it owed no duty to keep a lookout or inspect underneath a railcar near the middle of the Train as it was being switched in the Yard.

**(3)     Union Pacific Did Not Breach Duty Owed to Thomas**

39.     Alternatively, assuming Union Pacific owed Thomas a duty of care, it is still entitled to a summary judgment because it did not breach any duty owed to Thomas.

40.     To prove an action for negligence, the plaintiff must establish the defendant breached its legal duty. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). The summary-judgment evidence clearly shows Union Pacific did not breach any duty owed to Thomas because (a) the railroad tracks, posted signage, and active train operations warned Thomas

of the potential dangers as she approached and entered the Yard; (b) Thomas was warned of the Train's potential for movement before crawling under the railcar; (c) the Train gave both audible and visual warnings prior to and during its movements; and (d) Union Pacific inspected the accident location before the accident and there was no duty to re-inspect.

### (a)  Thomas Warned by Posted Signage and Active Train Operations

41.     Thomas cannot claim she was unaware of the obvious danger presented by crossing railroad tracks and crawling underneath a railcar as the mere presence of the railroad tracks served as a warning of the potential dangers. *Barnes*, 2016 WL 4801511 at *3 ("Railroad tracks, like roadways, present an inherent danger"); *see San Antonio & A.P. Ry. Co. v. Singletary*, 251 S.W. 325, 326 (Tex. Civ. App.—San Antonio 1923, writ dism'd w.o.j.) (a railroad track is itself a proclamation of danger); *see also McBeth v. Tex. & Pac. Ry. Co.*, 414 S.W.2d 45, 49–50 (Tex. Civ. App.—Fort Worth 1967, writ ref'd n.r.e.) ("A person who has knowledge of a railroad crossing is charged with knowledge of existing danger from trains which may be moving thereon.").

42.     Thomas also received specific warnings of the potential dangers by the Yard's posted signage and active train operations. As she approached and entered the Yard, the posted signage warned against trespassing and of the use of remote-control locomotives. In addition to the passive signage, Thomas would have been warned by the fact the Yard was an active railyard operating 24 hours a day, every day of the year. The noises, lights, and activity associated with the Yard's train operations were constant and loud, and served as a warning of the dangers associated with railroads to anyone near the Yard. Exhibit B, Swift Deposition, pg. 63, ln. 16–24; Exhibit D, Walker Deposition, pg. 54, ln. 12–19. "Nothing could be more pregnant with warning of danger than the noise and appearance of a huge, rumbling, string of railroad cars." *Nixon v. Norfolk S.*

*Corp.*, 295 Fed. Appx. 523, 525 (3d Cir. 2008) (quoting *Herrera v. S. Pac. Ry. Co.,* 10 Cal. Rptr. 575, 580 (Cal. Ct. App. 1961)); *Alston v. Baltimore & O. R. Co.*, 433 F. Supp. 553, 570 (D.D.C. 1977).

43.     Thomas even admitted knowing the accident location was not a public crossing and that she should not crawl under the railcar. The only reasonable inference is that Thomas knew she should not be there and knew what she was doing was dangerous.

### (b)     Thomas Warned by Train's Active Movement

44.     Thomas was warned of the Train's potential for movement before crawling under the railcar because it was actively moving before the accident. After entering the Yard, Thomas approached the Train at the accident location and waited next to it for "about five minutes" before crawling underneath the railcar; meaning, the Train was already there when she arrived. As shown above, from approximately 12:14:40 a.m. until 12:52:39 a.m., the Train occupied the accident location and was actively switching cars. During that time, the Train did stop, but only for 53.56 seconds on average and the longest being 3 minutes and 23 seconds. Thomas would have seen the Train moving before crawling under the railcar because she (a) approached the Yard traveling east along Ley Road (facing in the direction of the Train); (b) entered the Yard and approached the Track traveling east (again facing in the direction of the Train); and (c) waited next to the Train for about five minutes before crawling under the railcar.

### (c)     Train Gave Audible and Visual Warnings Before Movement

45.     Thomas was also warned by the Train's audible and visual warnings made prior to and during each movement as it occupied the accident locations from approximately 12:14:40 a.m. until 12:52:39 a.m. Prior to each movement, the locomotive bell automatically rang, and the strobe lights flashed to warn of its movement. The locomotives' diesel engines, air brake system, brake

rigging, and coupler system all gave audible warnings as movement began. Additionally, the slack action between the railcars would have created a loud, distinct domino effect of noise as movement started at the locomotive end and worked its to the end. This slack action would have occurred each time the Train started and stopped during the switching operations. Not only would Thomas have heard the slack action as she approached and stood next to the Train before crawling under the railcar, but also, she would have heard the domino effect of noise approaching her as she was under the railcar.

### (d) Union Pacific Inspected Track Before Accident, No Duty to Re-inspect, Protected Movements

46.     In addition to the warnings provided to Thomas, Union Pacific also inspected the Track before the accident, had no duty to re-inspect after the initial inspection, and provided on-track protection against obstructions ahead of the Train's direction of travel.

47.     Before a train can occupy an RCZ, the RCZ must be activated by an employee physically riding a locomotive through the zone to check the track for obstructions. Exhibit D, Walker Deposition, Pg. 20, ln. 3–pg. 22, ln. 24; pg. 46, ln. 9–pg. 49, ln. 16; Exhibit B, Swift Deposition, pg. 65, ln. 5–20. Walker verified the RCZ and accident location were activated and clear before the Train occupied the RCZ. Thomas approached the Track after the Train was already occupying the accident location, meaning the RCZ had been activated and inspected before she arrived. Exhibit D, Walker Deposition, pg. 52, ln. 19–pg. 53, ln. 9.

48.     Once a train activates a RCZ, that train "owns" the RCZ and is allowed to move back and forth within the zone without any requirement, from either Union Pacific rules or federal regulations, to re-inspect. Exhibit D, Walker Deposition, pg. 22, ln. 25–pg. 24, ln. 6; pg. 48, ln. 18–24; pg. 56, ln. 6–12; Exhibit C, Okenkpu Deposition, pg. 29, ln. 8–pg. 30, ln. 6; Exhibit A, Affidavit of Bill Hill, pg. 11-12; *see* 49 C.F.R. § 218.99(d) ("After an initial track is clear

determination has been made in an activated remote control zone, it is not necessary to make a new determination prior to each subsequent shoving or pushing movement").

49.     Furthermore, Union Pacific provided on-track protection against obstructions ahead of the Train's direction of travel. At the time of the accident, 49 C.F.R. § 218.99 required that Conductor Walker observe and protect the Train's "end" or shoving movements, and not engage in any activity that would distract his attention from those duties. Mr. Walker was located at the "pin-pulling position" at the end of the Train opposite from the remote-control locomotive in order to visually determine if the Track was clear in the Train's direction of travel and release cars onto different classification tracks. Thomas was not struck by the end movements of the Train, but a car in the middle of the consist. However, Berry's assertion that Mr. Walker should have been in a different location or engaged in other activities would require him to violate his primary and most important responsibility of observing and protecting his train movement.

50.     In summary, Union Pacific did not breach any duty owed to Thomas because Thomas was warned of the potential dangers as she approached and entered the Yard by the posted signage, active train operations and movement, and audible and visual warnings of the Train. Union Pacific inspected the accident location and there was no duty to re-inspect, and Union Pacific monitored the Rail Yard for unauthorized persons. For these reasons, Union Pacific is entitled to summary judgment on Berry's negligence claims.

**(4)     Thomas's Actions Proximately Caused Her Own Injuries**

51.     Union Pacific is entitled to summary judgment because Thomas's actions, and not Union Pacific's alleged breach, were the proximate cause of her injuries.

52.     To prove an action for negligence, the plaintiff must establish the defendant's breach of duty proximately caused the plaintiff's injury. *Nabors Drilling, U.S.A., Inc. v. Escoto*,

288 S.W.3d 401, 404 (Tex. 2009); *Peerenboom v. HSP Foods, Inc.*, 910 S.W.2d 156, 164–65 (Tex. App.—Waco 1995, no writ). Proximate cause consists of two elements: cause-in-fact and foreseeability. *W. Investments, Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex. 2005). "These elements cannot be established by mere conjecture, guess, or speculation." *Id*. (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995)). The test for cause-in-fact, or "but for" causation, is whether the defendant's act or omission was a substantial factor in causing the injury and without which the injury would not have occurred. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010). Cause-in-fact is not established when the defendant's conduct is too attenuated or remote from the plaintiff's injuries to be considered a substantial factor. *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 266 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Similarly, if the defendant's negligence merely furnished a condition that made the injuries possible, there can be no cause-in-fact. *See IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 799 (Tex. 2004).

53.     Thomas voluntarily chose to trespass through the Yard, ignored warning signs, did nothing to alert others to her presence or seek help, and crawled underneath a railcar, despite both audible and visual warnings. In doing so, Thomas failed to exercise any regard for her own safety, and her injuries were the natural and probable result of her actions. Thomas's injures would not have occurred if she had not placed herself in a dangerous position. It is well settled that one who crosses a railroad track must, as a matter of law, exercise some degree of care for her own safety. *See Gulf, C. & S.F. Ry. Co. v. Gaddis*, 208 S.W. 895, 896 (Tex. Comm'n App. 1919); *see, e.g., San Antonio & A.P. Ry. Co. v. Singletary,* 251 S.W. 325, 326 (Tex. Civ. App.—San Antonio 1923, writ dism'd w.o.j.) ("A railroad track is of itself a proclamation of danger."); *Rutherford v. Ill. Cent. R. Co.*, 276 F.2d 330, 336 (5th Cir. 1960) ("The tracks are silent but potent signals of

danger."). Any person that is on or near the railroad tracks has an affirmative duty to step aside and give the train sufficient room to pass him or her safely. *See Davenport v. Texas & N.O.R. Co.*, 72 S.W.2d 933 (Tex. Civ. App.—Austin 1934, no writ).

54.     Furthermore, Thomas was not forced to take those dangerous actions. This accident occurred inside the Yard, and not at a public crossing. Thomas had safe alternatives available to her within a short distance, yet she chose a dangerous course of action for personal convenience. Instead of trespassing through the Yard, Thomas could have crossed over the Yard using the protected sidewalks on the Ley Road overpass. Once inside the Yard, Thomas could have waited for the Train to pass, walked towards the front or rear of the Train, turned around and gone back the way she came, or sought out help.  When asked why she did not, Thomas testified "I don't know" or "I didn't think of that". Exhibit F, Thomas Deposition, pg. 53, ln. 25–pg. 54, ln. 8; pg. 62, ln. 22–24. Thomas voluntarily continued on a dangerous course of action, and in the process, failed to exercise any degree of care for her own safety and should be barred from recovery. "If it was true that the place at which [*the pedestrian*] was walking when he received his injuries was unsafe, and that within a convenient distance there was a safe place at which he might have walked and that he voluntarily chose to continue in the dangerous place, then his act constituted such negligence as would bar a recovery." *Missouri, K. & T. Ry. Co. of Tex. v. Wall*, 116 S.W. 1140, 1141 (Tex. 1909).

> An implied permission, such as is claimed, to use a railroad track as a footpath may relieve the person enjoying it of the imputation of being a trespasser, but it does not relieve the place of its inherent dangers, nor exempt the traveler from the duty to act with ordinary prudence. When he voluntarily chooses the dangerous pathway, instead of a safe one beside it, we can see no escape from the conclusion that he is guilty of negligence, if there be no justifying or excusing circumstances.

*Tex. Midland R. Co. v. Byrd*, 115 S.W. 1163, 1165 (Tex. 1909) (quoting *Gulf, C. & S.F. Ry. Co. v. Matthews*, 93 S.W. 1068 (Tex. 1906)).

55.     Thomas and Berry both acknowledge this accident would not have happened but for Thomas's actions. Thomas testified that if she had used the Ley Road overpass, instead of cutting through the Yard, this accident would not have happened. Exhibit F, Thomas Deposition, pg. 57, ln. 22–25. She also testified that if she had not crawled under the railcar, this accident would not have happened. *Id*., pg. 58, ln. 1–4. Berry testified Thomas should not have cut through the Yard, and instead she could have used the sidewalk on the Ley Road overpass. Exhibit E, Berry Deposition, pg. 63, ln. 13–23. She also agreed that it is dangerous to crawl between the railcars, and that if Thomas had not crawled between the railcars, this accident would not have happened. *Id*., pg. 64, ln. 3–9. Any negligence on Union Pacific's part, which is denied, merely furnished a condition that made Thomas's injuries possible.

56.     Because the evidence clearly shows Thomas's actions, and not Union Pacific's alleged breach, were the proximate cause of her injuries, Union Pacific is entitled to a summary judgment on Berry's negligence claims.

## C.     No Basis for Gross Negligence

57.     Union Pacific is also entitled to a summary judgment on Berry's gross negligence claims because (a) Berry's underlying negligence claims fail, and (b) Berry has no summary judgment evidence of the objective or subjective elements of gross negligence.

58.     For the reasons discussed above, Plaintiff's negligence claims against Union Pacific fail as a matter of law. Because there is no basis for Plaintiff's negligence claims, Plaintiff's gross negligence claims must also fail. Absent a finding of negligence, there can be no gross negligence. *See, e.g., Louisiana-Pacific Corp. v. Andrale*, 19 S.W.3d 245, 247 (Tex. 1999).

59.     Additionally, Berry has no evidence to support the elements of a gross negligence claim. Gross negligence requires a showing that:

(1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed[s] in conscious indifference to the rights, safety, or welfare of others.

*Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001) (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)); *see* Tex. Civ. Prac. & Rem. Code § 41.001(11). Under the first, objective element, an extreme risk is "not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff." *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). Under the subjective element, "actual awareness means the defendant knew about the peril, but its acts or omissions demonstrated that it did not care." *Id.* Berry has no summary judgment evidence of the objective or subjective elements of gross negligence. Instead, as discussed above the summary judgment evidence clearly shows Thomas was warned, Union Pacific inspected the area, and kept a lookout.

60.     As such, Union Pacific is entitled to summary judgment on Plaintiff's gross negligence claims as a matter of law.

## VIII. PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant Union Pacific prays its motion for summary judgment be granted, in all parts, that the claims filed by Plaintiff be dismissed, and for such other and further relief at law or in equity to which Union Pacific is entitled.

Respectfully submitted,

*/s/ Robert Piwetz*
John W. Proctor
Attorney-in-Charge
State Bar No. 16347300
SD Fed Bar #3622729
jproctor@brownproctor.com
Robert K. Piwetz
State Bar No. 24041700
rpiwetz@brownproctor.com
Brown, Proctor & Howell, LLP
830 Taylor Street
Fort Worth, Texas 76102
Telephone: 817-332-1391
Facsimile: 817-870-2427

**ATTORNEYS FOR DEFENDANT
UNION PACIFIC RAILROAD COMPANY**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 23, 2023, a true and correct copy of the foregoing was served on Plaintiff's counsel via the Court's eFiling system and/or e-mail transmission, in accordance with the Federal Rules of Civil Procedure.

*/s/ Robert Piwetz*
Robert Piwetz